PEOPLE ex rel. McCARTHY v. BAKER, Police Com'r.

(Supreme Court, Appellate Division, Second Department.   February 17, 1911.)

MUNICIPAL CORPORATIONS (§ 185*)—OFFICERS—REMOVAL—GROUNDS.

Evidence *held* not to justify a finding that a member of the police force of the city of New York was guilty of the crime of breaking into a person's apartments at night, and the action of the police commissioner in dismissing him was unauthorized.

[Ed. Note.—For other cases, see Municipal Corporations, Dec. Dig. § 185.*]

Certiorari by the People, on the relation of John J. McCarthy, to review a determination of William F. Baker, as Police Commissioner of the City of New York, in dismissing relator from the police force.   Order dismissing relator annulled, and relator reinstated.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Argued before JENKS, P. J., and BURR, THOMAS, CARR, and WOODWARD, JJ.

Louis J. Grant and Jacob Rouss, for relator.

James D. Bell and Frank Julian Price, for respondent.

WOODWARD, J. The charges against the relator are that he has been guilty of neglect of duty and violation of rules, the specifications being that he was absent without permission from the Sixth Precinct station house from about 12:15 a. m., until about 7:30 a. m., October 22, 1909, during his tour of reserve duty from 12 midnight until 8 a. m., on October 22, 1909; that relator failed to enter in said station house blotter that he was absent from said station house during that tour of reserve duty; that the relator on his return and during his said tour of reserve duty (between 7:30 and 8 o'clock a. m., on October 22, 1909) did fail to enter in said station house blotter the fact that he had been absent from said station house; and that relator did falsely enter in the said blotter that he had been on reserve for his tour of reserve from 12 midnight to 8 a. m. on October 22, 1909. A second charge of conduct unbecoming an officer, violation of rules and of neglect of duty, embraced two specifications: First, that relator while absent from reserve duty without permission did at about 7:30 a. m. on October 22, 1909, at 83 Bayard street, Manhattan, while under the influence of some intoxicating agent, threaten with assault with a black-jack one Fred Barone and used vile, indecent, and profane language; and, second, that relator about 1:30 a. m. entered premises at 89 Bayard street and did unlawfully, with force and violence, effect an entrance into the apartments of one Dominick Vaccaro, by breaking in the door, and did therein use vile, indecent, and abusive language to Rose Vaccaro, and did display a black-jack and threaten and assault said Rose Vaccaro.

The story to be gathered from the testimony of Rose Vaccaro, the complaining witness, is to the effect that she was married to Dominick Vacarro on the evening of October 21, 1909; that at some time near midnight she repaired to her apartments with her husband; and that after they had been in bed some little time, and about 1:30 o'clock in the morning, the door leading into her apartments was battered down by a company of men, the relator among the number, who invaded the sleeping room and indulged in coarse, vulgar, and obscene conduct, including an assault upon the complaining witness, her husband being present and finally inducing the intruders to go away. The complaining witness had never known the relator. She says the way she knew that relator was among the revelers was that her husband told her that he was there, but the husband, who was concededly present, says that he did not see the relator there, and while his examination is not entirely clear and satisfactory, and is not entirely in harmony with an affidavit which he had made before the third deputy commissioner some days previously, it may be fairly said that the testimony of the husband does not show that the relator was present in his room during the early morning of October 22, 1909, and

there is no evidence corroborating the complaining witness, who appears, naturally enough, to have been greatly excited. She testifies that at one time her husband was trying to strike his own brother, who was one of the intruders, and that he was prevented from doing so by the relator, and then, after repeating this story, she finally concludes that this was a mistake, and the only ground for her statement that the relator was present is the claim that her husband told her that he was among those present, while the testimony of the husband is to the effect that the boys, friends of his, told him that the lieutenant was present while his head was covered up with the bedclothes, and the husband makes no claim either that the relator or any one else assaulted him or threatened to assault him, or interfered in any way with his striking his own brother. In fact, the evidence goes little, if any, farther than to show that some friends of the husband broke into the apartment to serenade the couple; that there was some talk; that the husband asked them to go away; that they complied with the request; that subsequently some of them came back and continued the serenade, finally leaving; and that there was a declaration on the part of these marauders that the lieutenant, not definitely identified as this particular lieutenant, was present. It does not appear that there was any light in the apartment, or that the complaining witness knew the relator's voice, or even that she saw him with sufficient clearness to distinguish him from any one of the others present, and the husband refused to swear that the relator was present, or that he was sufficiently familiar with his voice to recognize it among the others. The complaining witness' brother-in-law was concededly in the party, but he does not appear as a witness, and this is true of several of the other friends of the husband, any one of whom, we may assume, could have told whether the relator was present or not.

In opposition to this flimsy case against the relator, he takes the stand and swears that he has been in the police department for 17 years, with only trifling complaints against him; that for 14 years he had had no complaints; that he performed desk duty up to 8 p. m. on October 21st, and then performed his tour of patrol duty until midnight, when, as was his duty, he went on reserve until 8 a. m.; that at no time between midnight and 8 a. m. was he absent from the station house, and therefore did not enter the fact of such absence in the blotter. All of the charges hinge upon the question of whether the relator was present and participated in the disorderly conduct in the apartments of Dominick Vaccaro, and the defendant swears that he was not out of the station house during any of the time that the outrage is alleged to have taken place. He is corroborated in this to some degree by the testimony of Lieutenant Thomas Gleason, who testified that his tour of duty commenced at 12 midnight and ended at 8 a. m. on the 22d of October; that he saw relator shortly after he went on duty (presumably after 12 o'clock); that relator went behind the desk and signed the blotter and then started towards his room, and this was the last the witness saw of him; that relator was not intoxicated, and his condition was then normal. So

at some time after 12 o'clock of October 21st, or the morning of October 22d, this policeman of good standing was sober, was in a normal condition, registering in the usual manner, and starting for his room. At 7:30 in the morning of October 22d, the bootblack entered his room, took out his shoes, and polished them and returned them. At that time there was some one in the relator's bed, whom this witness assumed to be the relator, and 15 minutes later the doorman testified that he woke the relator; that he (the relator) was then lying in his bed asleep. This is exactly what we should expect to find if the relator had actually gone to his room at the time he started in that direction, after registering, with his tour ending at 8 o'clock in the morning. The act charged against the relator of breaking into the apartment of Dominick Vaccaro is a crime, no motive for which is given in the evidence. He was sober at some time after 12 midnight, and that condition once established may be presumed to have continued until a different condition was shown, and no one claims that the relator was drunk until 7:30 in the morning, at which time, as we have seen, two witnesses, unimpeached, substantially agree that he was in bed and asleep in the station house, and yet other witnesses, entirely entitled to credit, so far as appears from the testimony, met the relator between 8 and 9 of the same morning and found him sober then, entirely corroborating the relator in his testimony as to what occurred at 83 Bayard street, where the alleged assault upon the father of the complaining witness is alleged to have taken place. When we take into consideration the character of the evidence against the relator, and find him concededly sober after midnight, it is hard to believe that he deliberately walked out into the night and perpetrated a crime such as the prosecution has asserted. It would be hard to believe it if it was not denied; but, when it is denied in a simple, straightforward manner by a man whose general reputation is in no wise questioned, when he is supported in this denial by the surrounding circumstances, no effort being made to dispute the bootblack and the doorman as to the condition of the relator at 7:30 and 7:45 of the morning after this alleged crime, when it is still further supported by the testimony of witnesses who met him afterward and found him sober near the very hour when it is alleged he was drunk and violent toward the father of the complaining witness, we think it is asking too much of credulity to credit the story.

The order dismissing the relator should be annulled, and he should be reinstated to his position, with costs.

Determination of the commissioner annulled, and relator reinstated, with $50 costs and disbursements. All concur; THOMAS, J., in result.